# United States Court of Appeals

## For the First Circuit

No. 02-2277

JOYCE A. BOARDMAN,

Plaintiff, Appellant,

v.

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, COMPAQ COMPUTER
COMPANY F/K/A DIGITAL EQUIPMENT CORPORATION AND DIGITAL EQUIPMENT
CORPORATION GROUP POLICY GL-22181,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Judith G. Dein, U.S. Magistrate Judge]

Before

Boudin, Chief Judge,
Torruella and Lipez, Circuit Judges.

Edmund P. Hurley, with whom Blaine J. DeFreitas, was on brief
for plaintiff, appellant.
Edward P. O'Leary for defendant, appellee The Prudential
Insurance Company of America.
Douglas T. Schwarz, with whom Martha K. Harrison, was on brief
for defendants, appellees Compaq Computer Company F/K/A Digital
Equipment Corporation and Digital Equipment Corporation Group
Policy GL-22181.

July 23, 2003

**LIPEZ, Circuit Judge**.  Joyce A. Boardman ("Boardman") appeals from the district court's entry of summary judgment for The Prudential Insurance Company of America ("Prudential"), Compaq Computer Company (successor in interest to Digital Equipment Corporation and referred to throughout as "Digital"), and Digital's Long Term Disability insurance plan, Group Policy GL-22181 ("the Plan").  Boardman is a former participant in the Plan, a group long-term disability insurance policy provided by Prudential to employees of Digital, and governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq. (2002). Boardman had been receiving benefits under the Plan for more than six years when Prudential terminated her benefits on the ground that she no longer met the plan's definition of "total disability." After exhausting her administrative remedies, Boardman brought suit in the district court for the District of Massachusetts claiming that Prudential violated ERISA by arbitrarily and capriciously terminating her benefits.  The district court found that the decision to terminate benefits was not arbitrary and capricious and entered summary judgment for the defendants.  We affirm.[1]

---

[1]  In granting Digital's motion for summary judgment, the district court ruled that Digital is not properly a defendant in the case.  "[S]ince the relief sought is benefits payable by the Plan, the proper defendant is either the plan or the plan's fiduciaries." Boardman v. The Prudential Ins. Co. et al., No. 01-10490m slip op. at 22 (D. Mass. Sept. 5, 2002) (citing Terry, 145 F.3d 28, 35-36 (1st Cir. 1998)).  Boardman did not dispute this contention before the district court and does not address it on appeal.  Indeed, all of the parties and the district court agree

-2-

# I.

We draw the relevant background facts from the summary judgment record, leaving a discussion of controverted facts for the analysis in Part III.

## A. The Plan

Boardman began working for Digital on April 1, 1974. As a Digital employee, Boardman was covered by Digital's Long Term Disability insurance plan ("the Plan"). Prudential underwrites and is the claims administrator for the Plan, which grants Prudential discretion to determine entitlement to long-term disability benefits and provides that benefits are paid upon proof of eligibility being furnished to Prudential. Under the terms of the Plan, after an elimination period of twenty-six weeks, a Digital employee is eligible for long term disability benefits only if Prudential finds that the requirements of Total Disability outlined in the Plan have been met. The Plan's Schedule of Benefits defines "Initial Duration" as the twenty-six-week Elimination Period plus twenty-four months. During the Initial Duration, Boardman had to demonstrate to Prudential that, due to her illness, she was unable to perform the duties of her job as Project Manager. After twenty-four months, in order to remain eligible for benefits, Boardman had

---

that "the Plan directed Prudential, not Digital, to make exclusive eligibility decisions. The Plan did not reserve responsibility for any discretionary eligibility-related duties to Digital." Id. at 23. We find no fault with the ruling on Digital and do not address it further.

to show that she was unable to perform any job for which she is reasonably fitted by education, training and experience. The terms of the Plan provide that "Prudential, at its own expense, has the right to examine the person whose loss is the basis of a claim. Prudential may do this when and as often as is reasonable while the claim is pending."

### B. Boardman's Illness and Her Eligibility for Benefits

Boardman stopped working for Digital on December 10, 1991. At the time, she was employed as a "Project Manager I," a position that entailed managing engineers and conducting site visits with customers, and required vision, hearing and speech in ordinary conversation. The position did not require lifting or carrying, and consisted of sixty percent sitting, twenty percent standing, and twenty percent walking.

In the years leading up to the termination of her employment, Boardman suffered from diffuse symptoms. As reported by Dr. Anthony L. Esposito, an infectious disease specialist to whom Boardman was referred by her primary physician, Dr. Stephen Neustat, Boardman described her condition in January 1992 as follows:

> For the past three to four years she has had fatigue, somnalence, recurrent "colds and flu," and more recently, three to four episodes of "parotitis";[2] the latter have been

---

[2] Parotitis is the inflamation of the parotid salivary glands. Random House Webster's Unabridged Dictionary 1413 (2d ed.

-4-

> characterized by local pain, tenderness and
> swelling without fever or chills.

In a February 21, 1992 letter to Dr. Neustat, Dr. Esposito concluded that, "based on the available data," Boardman suffered from "chronic persistent Epstein Barr viral disease characterized by both systemic manifestations as well as recurrent parotitis." In addition to Dr. Neustat and Dr. Esposito, Boardman was treated by Dr. Alan B. Marks and Dr. Alan I. Brenner, both of whom are rheumatologists.

Over the next several years, Boardman continued to suffer from a "large constellation of problems," although, according to Dr. Marks, her doctors "have never been able to pin down a specific diagnosis." Although Dr. Esposito concluded in February 1992 that Boardman suffered from Epstein Barr viral disease, he conceded "the possibility of other conditions that might be producing these manifestations" and suggested that Dr. Neustat refer Boardman to a rheumatologist. On March 23, 1992, Dr. Marks, one of Boardman's rheumatologists, opined that "the most likely unifying diagnosis is Sjogren's syndrome"[3] and that he was "not sure what role, if any,

---

1997).

[3] Sjogren's syndrome is an autoimmune disorder in which immune cells attack and destroy the glands that produce tears and saliva. Sjogren's syndrome is also associated with rheumatic disorders such as rheumatoid arthritis. National Institute of Neurological Disorders and Stroke, NINDS Sjogren's Syndrome Information Page, at http://www.ninds.nih.gov/health_and_medical/disorders/sjogrens_doc.htm (December 2001).

EB [Epstein Barr] virus is playing in this." By July 1992, Dr. Neustat reported to Prudential that the symptoms were "clearly recognizable as Sjogren's," which is a "type of Lupus," and that Epstein Barr virus "is no longer an issue." However, in a June 1, 1995, letter, Dr. Neustat reported that "Patient has chronic active Epstein Barr viral infection with recurrent parotitis," and on May 29, 1997, Dr. Marks stated that "[i]t is possible that she does have chronic fatigue, sicca syndrome, and myalgias related to EBV disease." On November 2, 1998, Dr. Brenner opined that "I do not believe a diagnosis of Sjogren's syndrome is appropriate or helpful." Despite these varying diagnoses, Boardman continued to suffer from chronic fatigue, musculoskeletal pain, and parotitis.

Boardman applied for long term disability benefits under the Plan on May 8, 1992. Prudential approved the claim and benefits began on June 10, 1992. On May 17, 1993, Digital informed Prudential that it had received a letter indicating that Boardman was working at her husband's auto shop. In response, Prudential contacted Dr. Neustat on May 19, 1993, for an update on Boardman's medical condition, and on July 15, 1993, Prudential conducted a home visit with Boardman in order to review Boardman's claim status. Dr. Neustat reported that Boardman "had more joint symptoms than ever before," had developed arthritis symptoms and swollen joints, and could "hardly hold a pen or pencil." Based on

this information and Prudential's impressions of Boardman during the home visit, Boardman's benefits were continued.

Boardman's twenty-four-month Initial Duration period ended on June 9, 1994.  Thereafter, to remain eligible for benefits, Boardman had to show that she was disabled from the duties of "any job for which [she is] reasonably fitted by [her] education training or experience."  Accordingly, in April 1995, Prudential requested updated medical records from Boardman's doctors.  Included in Dr. Marks's records was a March 31, 1995 report stating that Boardman suffers from "extreme fatigue, bilateral parotid swelling, dryness of eyes, myalgias, and recurring neck pain," and concluding that "[b]ecause of the above symptoms, particularly fatigue, arthralgias and myalgias, the patient is unable to work."  In a letter to Prudential dated June 1, 1995, Dr. Neustat summarized Boardman's complex condition as "reduced energy and recurrent parotitis with recurrent bacterial respiratory infections."  Prudential continued to pay benefits to Boardman.[4]

---

[4]   During this time, Boardman applied for Social Security benefits.  Her claim was denied in January 1995 and again in April 1995.  On July 23, 1995, after a hearing, an Administrative Law Judge reversed the decision, finding that Boardman suffered from recurrent EBV, Sjogren's syndrome, Hashimoto's thyroiditis, fibromyalgia, chronic fatigue and joint pain, and that "as a result of the limitations imposed upon the claimant by this severe medically determinable impairment, [s]he would be restricted from performing even sedentary work on a sustained basis."  However, it is well-established that "benefits eligibility determinations by the Social Security Administration are not binding on disability

On February 20, 1997, Prudential again sought an update of Boardman's medical status and sent an Attending Physician Statement to Boardman for her doctor to complete. On June 14, 1997, Dr. Neustat completed the form, noting that "Patient has not made any significant improvement" and that "no changes [are] expected in near future" to Boardman's "permanent limitations." After receiving this information, Prudential extended Boardman's benefits for an additional year.

## C.  Termination of Boardman's Benefits

On March 18, 1998, consistent with its rights under the Plan, Prudential required Boardman to undergo an independent medical examination ("IME") with Dr. Hubert I. Caplan, a board certified rheumatologist. She was instructed to bring all x-rays, test results and medical records with her to the exam, and Prudential forwarded to Dr. Caplan a complete copy of the medical information in its file, which included information relating to Boardman's education, training and experience. Prudential requested that Dr. Caplan include in his report (1) the patient's history; (2) objective findings noted during the examination; (3) reasons that the patient could not perform her job or other jobs; (4) limitations and restrictions placed on the patient; (5) medications or therapy that would facilitate recovery; (6)

---

insurers." Cook v. Liberty Life Assurance Co., 320 F.3d 11, 16 n.5 (1st Cir. 2003).

activities, in relation to the patient's job and other jobs, that she could perform now; and (7) when the patient might be able to return to work.

Dr. Caplan examined Boardman on April 30, 1998. In addition to conducting a physical examination and discussing Boardman's symptoms, he reviewed Boardman's job description with her. He issued a report on May 1, 1998:

> In my opinion, a definite diagnosis has not been established. There is no support for [S]jogren's, or fibromyalgia and the significance of Epstein-Barr virus antibody titres is uncertain at best and any correlation with clinical problems cannot be proven, in general, and in my opinion, especially in Mrs. Boardman's case.
>
> A systemic rheumatic disorder such as mild rheumatoid arthritis is possible. She my [sic] have a mild recurrent idipathic [sic] parotitis with a mechanical component, however, the reason for her subjective constitutional complaints is obscure. A primary or reactive (secondary) psychogenic disorder is possible also.
>
> Having said this, it is my opinion that even if one or more of the above listed diagnoses were established, her current condition is not such that renders her totally disabled from her own occupation or from any other similar occupation. In fact, perhaps a return to work could provide the incentive not to give in to periods of somnolence and exhaustion which may, in large part, be biologic, i.e. such symptoms at midday and early p.m..
>
> I have reviewed her job description with her. This includes both managing engineers and site visits with customers. She is able to drive and is able to do this work. Certainly a

position with somewhat less responsibility and stress would even be more appropriate.

By letter dated May 20, 1998, Prudential notified Boardman of its decision to terminate her benefits, effective August 1, 1998, based on its determination that Boardman no longer met the Plan's definition of Total Disability. The letter indicated that this determination was based on Boardman's medical records, the Attending Physician statement completed by Dr. Neustat on June 14, 1997, and the results of the IME. The letter also informed Boardman of her right to appeal the decision and submit additional evidence or documentation on appeal.

Boardman appealed Prudential's determination that she was no longer Totally Disabled by a letter dated June 16, 1998. Although she did not submit any further documentation, she directed Prudential's attention to the definition of Total Disability "along with Dr. Neustat's diagnosis that clearly show [sic] Ms. Boardman is totally disabled and eligible for LTD benefits." On June 29, 1998, Prudential confirmed its decision and notified Boardman of her right to a second appeal. Once again, Prudential informed Boardman that "[t]he appeal may identify the issues and provide other comments or additional evidence she wishes [to have] considered, as well as any pertinent documents she may wish [to have] examine[d]."

By letter dated July 7, 1998, Boardman stated her intention to pursue a second appeal, requested information about

the appeals process, and requested copies of all the documents used by Prudential in reaching its decision. Prudential sent the requested information to Boardman on August 12, 1998, including a summary of Prudential's appeals process. By letter dated February 9, 1999, Boardman submitted her second appeal of Prudential's decision, specifically referring to Dr. Neustat's office note of January 21, 1999, which states "Impression: Chronic active Ebstein [sic] Barr viral infection with debilitating chronic fatigue which meets the criteria for total disability."

In response to Boardman's second appeal, Prudential asked Boardman to forward complete medical records for the period of June 1997 through the present from Dr. Neustat, Dr. Marks, Dr. Esposito, and Dr. Brenner. Upon receipt of these updated medical records, Prudential forwarded them to Dr. Caplan for review. Dr. Caplan concluded that "the additional documentation does not change his overall summary or the conclusions and opinions" expressed in his prior report. Based on this review and the fact that "Dr. Neustat did not include any objective evidence of impairment as a result of [his] diagnoses," Prudential once again upheld its decision to terminate Boardman's benefits.

Boardman requested a final appeal by the Appeals Committee on June 30, 1999, but did not submit any additional documentation. After an initial review of Boardman's medical file, including documentation from Dr. Neustat, Dr. Marks, Dr. Esposito,

and Dr. Brenner, the Appeals Committee requested that Boardman submit all records of treatment by any other physicians and the results of an EMG test that Dr. Marks requested for Boardman in June of 1998. Boardman responded that in the past two years she had only been treated by the doctors whose records were included in her file, and that the EMG test mentioned by Dr. Marks was never performed.

By letter dated August 4, 1999, Prudential informed Boardman that the Appeals Committee had decided to uphold its decision to terminate her benefits. The Appeals Committee noted that while Dr. Neustat opined that Boardman's chronic active Epstein Barr viral infection with debilitating chronic fatigue met the criteria for total disability, "Dr. Neustat does not state what criteria for Total Disability he is referencing in his opinion." The Committee also found it significant that Dr. Marks, in his June 1998 letter, "does not comment on Ms. Boardman's ability (or lack of ability) to function in any type of employment, nor in her activities of daily living." The Committee concluded that "[n]one of the specialists that have treated Ms. Boardman in the past two years have indicated any limitations or restrictions, based on objective findings, that would preclude Ms. Boardman from performing any occupation for which she is suited." On this basis, and in light of Dr. Caplan's determinations, the Appeals Committee

upheld Prudential's decision to terminate Boardman's long term disability benefits effective August 1, 1998.

## II.

We review the district court's grant of summary judgment de novo. Terry v. Bayer Corp., 145 F.3d 28, 34 (1st Cir. 1998). However, if the language of the underlying plan reserves discretion to the insurer in determining eligibility for benefits, a federal court reviews an insurer's termination decision "under a deferential arbitrary and capricious standard." Cook, 320 F.3d at 18 (quoting Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 415, 418 (1st Cir. 2000)).

In this case, the parties agree that the terms of the Plan grant Prudential the discretion to determine eligibility for benefits. Therefore, like the district court, we can overturn Prudential's termination decision only if "the insurer's eligibility determination was unreasonable in light of the information available to it." Pari-Fasano, 230 F.3d at 419. Contrarily, the insurer's decision must be upheld "if it was within [the insurer's] authority, reasoned, and supported by substantial evidence in the record." Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998) (internal quotation marks and citations omitted). The existence of contrary evidence does not necessarily render Prudential's decision arbitrary. Vlass v.

Raytheon Employees Disability Trust, 244 F.3d 27, 30 (1st Cir. 2001).

### III.

Under the Plan, eligibility for long term disability benefits is contingent upon three requirements: (1) due to sickness or accidental injury, the claimant is not able to perform the duties of her own or any other occupation; (2) the claimant is not working at any job for wage or profit; and (3) the claimant is under the regular care of a doctor. In this case, only the first requirement is at issue. The first requirement, in turn, involves a two-pronged showing: the claimant must show that she is sick or injured and the claimant must show that due to this illness or injury she is unable to perform the material and substantial duties of her own, or any other occupation for which she is reasonably suited. In Prudential's eyes, Boardman failed to establish this second prong--that her illness restricts her ability to perform the material and substantial duties of her own, or any other occupation for which she is qualified. We focus on that issue.

Boardman presented ample evidence, in the form of doctors' evaluations, Attending Physician Statements, and other medical records, documenting her illness. Both Dr. Caplan, the independent medical examiner, and Prudential carefully reviewed this documentation and were willing to accept, for the purpose of determining whether Boardman met the definition of Total

Disability, that she satisfied the first prong of the first disability requirement--that she is sick or injured. However, both Dr. Caplan and Prudential noted the absence of evidence showing that Boardman's illness rendered her unable to work.

Dr. Caplan concluded that "<u>even if</u> one or more of [Boardman's] diagnoses were established, her current condition is not such that renders her totally disabled from her own occupation or from any other similar occupation" (emphasis added). In her brief, Boardman criticizes Dr. Caplan's skepticism of the various diagnoses put forward to account for Boardman's symptoms, his suggestion that "a psychogenic disorder" could be involved, and his comment that "perhaps a return to work could provide incentive not to give in to periods of somnolence and exhaustion." While Boardman may have perceived these comments as insensitive, Boardman's allegations of a "prejudicial view that [Caplan] employs in his decision making process" are unpersuasive. Also, Boardman misses the central point of Dr. Caplan's analysis--that even if the diagnoses are established, Boardman's physical abilities are not so diminished as to prevent her from performing the duties of her own or any other similar occupation.

Although Dr. Neustat chronicled Boardman's symptoms in his office visit note dated January 21, 1999, and concluded that she meets the requirements of Total Disability, Prudential noted that he "does not state what criteria for Total Disability he is

-15-

referencing in his opinion."  Similarly, the Committee noted that although "[i]n his letter dated June 7, 1998, Dr. Marks indicates that Ms. Boardman continues to feel poorly . . . [and] recommended an EMG for Ms. Boardman's complaints of numbness and dropping things, an EMG was not performed.  [Dr. Marks] does not comment on Ms. Boardman's ability (or lack of ability) to function in any type of employment, nor in her activities of daily living."  In its final decision to terminate Boardman's benefits Prudential concluded:

> None of the specialists that have treated Ms. Boardman in the past two years have indicated any limitations or restrictions, based on objective findings,[5] that would preclude Ms. Boardman from performing any occupation for which she is suited.  Therefore, we have determined that Ms. Boardman does not meet the definition of disability as required by the policy.

Throughout the appeals process, Prudential advised Boardman of her failure to show how her illness rendered her unable

---

[5]  In <u>Cook</u> v. <u>Liberty Life Assurance Co.</u>, 320 F.3d 11 (1st Cir. 2003), an ERISA case in which the insured also suffered from chronic fatigue syndrome and fibromyalgia, we concluded that "[g]iven the nature of Cook's disease, it was not reasonable for Liberty to expect her to provide convincing 'clinical objective' evidence that she was suffering from CFS."  <u>Id.</u> at 21.  In this case, Prudential did not require Boardman to present objective medical evidence to establish her illnesses.  On the contrary, Prudential was willing to accept that Boardman suffered from the illnesses she reported to her doctors.  Rather, Prudential wanted objective evidence that these illnesses rendered her unable to work.  While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis.

-16-

to work, and informed her of her right to submit additional evidence and documentation that she wished to have considered. Repeatedly, Boardman's submissions on appeal consisted primarily of arguments based on existing documentation, with scant attention to her burden of showing that, due to her illness, she was unable to perform the duties of her own or any other similar occupation. Given (1) the absence of adequate evidence in Boardman's medical records indicating that Boardman's condition imposed limitations on her ability to perform the material and substantial duties of her own occupation or any other occupation for which she is suited, and (2) the evidence to the contrary provided in Dr. Caplan's reports, Prudential's determination that Boardman failed to meet the definition of Total Disability was not arbitrary or capricious.

## IV.

For the foregoing reasons, the decision of the district court is **<u>affirmed</u>**.