Marcia **LANDMAN**, Plaintiff,

v.

**THE PAUL REVERE LIFE INSURANCE COMPANY,** Defendant.

No. CIV.A.02–10888–NG.

United States District Court, D. Massachusetts.

Sept. 8, 2004.

Elizabeth L. Greene, Mirick, O'Connell, Worcester, MA, for The Paul Revere Life Insurance Company, Defendant.

Joseph M. Hamilton, Mirick, O'Connell, DeMallie & Lougee LLP, Worcester, MA, for The Paul Revere Life Insurance Company, Defendant.

Stephen L. Raymond, Law Office of Stephen L. Raymond, Esq., Haverhill, MA, for Marcia Landman, Plaintiff.

## ORDER

GERTNER, District Judge.

Order entered granting Motion for Summary Judgment, denying Motion for Judgment on the Pleadings and adopting Report and Recommendations. After carefully reviewing the Report and Recommendation and the objections filed thereto, I adopt the conclusions of the Magistrate Judge Dein for the reasons outlined in her Report and Recommendation.

### *REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT*

DEIN, United States Magistrate Judge.

#### I. *INTRODUCTION*

Plaintiff Marcia Landman ("Ms.Landman") brought this action against the defendant, The Paul Revere Life Insurance Company ("Paul Revere"), pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), after Paul Revere denied her claim for benefits under the Goldstein & Manello, P.C. Group Long Term Disability Insurance Plan (the "Plan"). The court previously ruled in connection with a motion for summary judgment filed by Paul Revere that the decision to deny Ms. Landman benefits should be reviewed under an arbitrary and capricious standard. (Docket # 23, adopted 9/22/03). The matter is presently before the court on the parties'

cross-motions for summary judgment on the merits.

For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that Paul Revere's Motion for Summary Judgment (Docket # 25) be ALLOWED, and that Plaintiff's Cross–Motion for Judgment on the Administrative Record (Docket # 29) be DENIED.

## II. STATEMENT OF FACTS [1]

The material facts of this case are undisputed, and are as follows:

### The Plan

Ms. Landman was born on September 29, 1953. (PF ¶ 2). In February of 2000, she was working as a legal secretary at the law firm of Goldstein & Manello, P.C. ("Goldstein & Manello"). (Id. ¶ 1). At that time, she was participating in the Goldstein & Manello, P.C. Group Long Term Disability Insurance Plan. (Id. ¶ 3; AR at 18). Goldstein & Manello is the Plan Administrator and Paul Revere, a subsidiary of UNUM Provident Corporation ("UNUM"), is the insurer of the Plan and the Claims Administrator. (PF ¶ 4; DR ¶ 4; AR at 18).

At issue in this case is Ms. Landman's qualification for "total disability" payments under the Plan. The Plan defines "Total Disability" as follows:

TOTAL DISABILITY or TOTALLY DISABLED means that during the first 24 months after completing the Elimination Period, the Employee:

1. is unable to perform the important duties of his own occupation on a Full-

time or part-time basis because of an injury or Sickness that started while insured under this Policy; and

2. does not work at all; and

3. is under Doctor's Care.

After 24 months of Own Occupation benefits have been paid, the Employee will continue to be Totally Disabled if he can not work in any occupation for which he is or may become suited by education, training or experience.

(AR at 36). The Plan's "Elimination Period" is 90 days. (Id. at 4, 26). Since Ms. Landman, as detailed below, claimed an onset of total disability beginning on February 16, 2000, the Elimination Period would have expired on May 16, 2000, and the "own occupation" definition of total disability would have applied from May 17, 2000—May 17, 2002. (PF ¶ 8).

### Ms. Landman's Employment as a Legal Secretary

Before she stopped working at Goldstein & Manello, Ms. Landman had been employed as a legal secretary for more than 27 years. (DF ¶ 2). She began working at Goldstein & Manello in 1983. (AR at 84). She worked five days per week, seven hours per day, and her job responsibilities were described in a written Job Description. (PF ¶ 10; DF ¶ 5; AR at 87–89). Generally, Ms. Landman was to perform "a variety of secretarial duties for attorneys" and maintain "positive contact with clients, attorneys and staff." (AR at 87). The "essential functions" of the job, defined as those the employee "must be able to perform unassisted or with some reasonable accommodation by the employer,"

1. In connection with the instant Motion, defendant Paul Revere submitted a "Statement of Uncontested Material Facts" (Docket # 27), which the court will refer to as "DF ¶ ___." In response, plaintiff Ms. Landman filed a "Counter–Statement of Facts" (Docket # 31), which will be referred to as "PF ¶ ___." Paul Revere also submitted a Response to plaintiff's Counter–Statement (Docket # 34), which will be cited as "DR ¶ ___." The Administrative Record (Docket # 15) will be cited as "AR at ___."

included typing and word processing, calendaring, filing, interacting with clients and visitors both over the phone and in person, keeping time-records and the like. (AR at 87–88). The position required just 2–3 years of on-the-job-experience, in comparison with Ms. Landman's decades of experience. (*Id.* at 88). Among a number of skills required for the job, the job description noted that the "[w]ork *occasionally* requires a high level of mental effort and strain while producing a high volume of information performing other essential duties." (*Id.* at 89) (emphasis added).

Ms. Landman stopped working at Goldstein & Manello on February 16, 2000. (PF ¶ 7; DR ¶ 7). The record is silent as to what specifically motivated her departure. On or about March 28, 2000, the firm submitted a claim for Plan benefits to Paul Revere on Ms. Landman's behalf. (PF ¶ 9; AR at 85).

### Ms. Landman's Medical Condition

Ms. Landman's claim statement indicated that she suffered from "recurrent seizures, epilepsy." (AR at 76). Her attending physician was Dr. Donald L. Schomer who specialized in neurology and epilepsy. (*Id.* at 92). According to Dr. Schomer, Ms. Landman's condition had first appeared in approximately 1990, and she required "medication adjustments." (*Id.*). Dr. Schomer was unable to predict when Ms. Landman would be able to return to work, finding that "I would like her seizure events to be less frequent before allowing her to return to work." (*Id.*).

Ms. Landman's medical history, as evidenced by the documentation submitted to Paul Revere, establishes a lengthy history of seizures which were treated with medication. As detailed below, this history shows that Ms. Landman's medical condition did not change substantially over the years, and that Ms. Landman was, in fact,

able to perform the essential functions of her occupation throughout those years. Thus, it was not arbitrary or capricious for Paul Revere to determine that Ms. Landman was not totally disabled in 2000.

Ms. Landman was first examined by Dr. Schomer on December 30, 1994, although she had suffered from seizure-like events for several years before then. (*Id.* at 145–46; PF ¶ 15). As Dr. Schomer reported, Ms. Landman suffered from recurring events which involved, primarily "shaking of rhythmic nature in the right arm and left leg" and "a sense of shortness of breath oftentimes associated with hyperventilation." (AR at 145). She had been treated with various medications over the years, and had been hospitalized on several occasions. (*Id.* at 146–47). Several of these events, including seizures and loss of vision, had occurred at work. (*Id.* at 146). Dr. Schomer recommended an MRI and "neuropsych testing since memory changes have been part of this . . . ." (*Id.* at 148–49).

An MRI was done in March, 1995 and the results were normal. (*Id.* at 263). Neuropsychological testing was done at Beth Israel Hospital in May, 1995, at which time Ms. Landman described her symptoms as follows:

Her seizures begin with the right hand or arm shaking and then progress to her left leg. She may become dizzy or lose her balance but does not lose consciousness. These events may last from a few minutes up to several hours, but typically last about one hour. Afterwards, she feels extremely fatigued. They occur twice per week on average. She also has spells in which she becomes dizzy and loses her balance, but there is no shaking. More recently she has had several episodes in which she loses her central vision for 5 to 60 minutes. Regarding cognitive functioning, she re-

ported a decline in memory over the last five years which she described as an inability to remember details of conversations and events. She did not think that there had been a change in other cognitive domains. Her sleep is fitful (initial insomnia and frequent awakenings), but several sleep studies have been essentially normal. She also reported a possible slight loss of hearing. (*Id.* at 125). Following a full battery of tests over two days, Dr. Margaret O'Connor, Director of Neuropsychology, concluded as follows:

> Marcia Landman is a 41-year old, right-handed woman whose neuropsychological profile revealed mild to moderate deficits in the retrieval of both verbal and visual material and mild attentional impairments. Additionally, there was evidence of right ear suppression on a dichotic listening test.... Of particular note is the failure of the test data to fully capture the striking inability of this obviously bright woman to articulate responses. This difficulty with expressive language was somewhat reflected on verbal fluency and reasoning tests which, while within the average range, were clearly reduced relative to her intelligence and academic achievements.... The interpretation of this profile is complex, but is suggestive of bilateral involvement.

(*Id.* at 128). "Since testing was consistent with Ms. Landman's complaints of a decline in memory" a repeat EEG was suggested. (*Id.* at 129).

Ms. Landman was seen again by Dr. Schomer in July, 1995, who agreed that an EEG was appropriate. (*Id.* at 141–43). The EEG was done on July 19, 1995. (*Id.* at 151–53). Dr. Schomer found the EEG to be "quite abnormal" although he attrib-

uted the abnormality to either the "patient lying on the electrodes and moving or very focal restricted seizure activity." (*Id.* at 140). The doctor decided to try a new medication, Lamotrigine. (*Id.*).

Ms. Landman next saw Dr. Schomer's colleague, Dr. Andrew Blum, several times while Dr. Schomer was on sabbatical. (*Id.* at 139). Approximately a year and a half after her last visit with Dr. Blum, she saw Dr. Schomer again on April 2, 1997. (*Id.*). At that time she was taking Lamictal 250 mg/twice a day.[2] Her seizure symptoms had "been significantly less as of late" although she had had an episode at work about a month before during which she "fell to the ground without losing consciousness, and had uncontrolled leg movements that lasted for several minutes." (AR at 138). Ms. Landman's biggest complaint was short-term memory problems, which Dr. Schomer believed "may be related more to attention than to memory dysfunction, per se." (*Id.*) Ms. Landman was also suffering from disruptive sleep patterns. (*Id.* at 139). In identifying "stressors," Ms. Landman reported that she was involved in a sexual harassment filing against one of her bosses at work, as a result of which she felt that her time was limited at the firm. (*Id.* at 138) Dr. Schomer recommended a follow up "in the near future" for a routine EEG and some memory testing if the problem persisted. (*Id.*).

Ms. Landman underwent further neuropsychological testing at Beth Israel Hospital on November 26, 1997. (*Id.* at 130). At that time, she described her symptoms as follows:

> She now experiences approximately one seizure every two weeks. She presents with complaints of memory difficulties which have undermined her work abili-

---

2. Lamictal is the trade name for Lamotrigine.     (PF ¶ 24).

ties and which interfere with her ability to retain details of daily events. She notes that her long-term recall is intact but that she has difficulty remembering details of more recent life events. She tends to lose her train of thought midstream. She has been bothered by these memory problems for many years. She had difficulty estimating when they began and whether they have increased over time. She also had difficulty speculating on their relationship to her seizures and/or her anticonvulsant medication regimen.

(*Id.*). Following a battery of tests Dr. O'Connor concluded that:

> Test findings indicated above average performance on measures of general reasoning, attention, mental flexibility, naming, and memory. To this extent, neuropsychological data were not consistent with her complaints of memory difficulties. However, it should be noted that some patients with epilepsy-based memory problems forget information at an accelerated rate which may occur over day to week-long intervals of time. Hence, standard neuropsychological tests are not always sensitive to the nature of their memory difficulties.

(*Id.* at 132). Dr. O'Connor recommended continued monitoring by Dr. Schomer, the use of an electronic organizer, and techniques for memorizing new information. (*Id.*).

On May 20, 1998, Ms. Landman was seen again by Dr. Schomer, after "having some breakthrough seizures" which included, while under stress at work, "trembling and shaking," and falling to the ground with "generalized convulsive movements." (*Id.* at 137). One incident took place in front of her boss, and lasted 10—15 minutes. (*Id.* at 135). After her boss took her home, Ms. Landman suffered periods of twitching and jerking of the legs which lasted several hours and left her exhausted. (*Id.*). About four months earlier she had started taking Prempro for early menopausal symptoms. (*Id.*). Dr. Schomer increased her medication to 300 mg of Lamictal twice a day, and recommended a 2–3 day hospital stay to wean Ms. Landman off that medication and begin a trial with Neurontin. (*Id.* at 137).

Thus, Ms. Landman was admitted to Beth Israel Hospital for a three day period covering June 30, 1998—July 2, 1998. (*Id.* at 273, 304). During that time she had several EEG's. The one on June 30, 1998 was "mildly abnormal." (*Id.* at 285, 169–70). On July 1, 1998 there "were no clear epileptic features" shown. (*Id.* at 286, 168). The EEG on July 2, 1998 was "within normal limits." (*Id.* at 304, 167). Dr. Schomer discharged Ms. Landman on Lamictal and a prescription for Klonopin. (*Id.* at 134). Dr. Schomer reported that "I suspect that some of the events are anxiety in origin. She does have an abnormal EEG at baseline with left temporal slowing and some isolated spike discharges but I could not document that the current events were convulsive." (*Id.*).

Ms. Landman was next seen by Dr. Schomer about a year later, on July 28, 1999. (*Id.* at 133). At that time, Ms. Landman had asked for a rather "urgent" appointment due to increasing "seizurelike symptoms," with episodes taking place several times a week for the last six weeks or so. (*Id.*). As she described her symptoms:

> The events she describes are ones where she oftentimes feels lightheaded. She can often lie down and it seems to pass but sometimes then when she thinks it's passed and she gets up to move and walk around, she again has a briefer period of lightheadedness and will wilt to the ground. She does not hit the ground hard but rather falls gently, does

not injure herself in the process. When she is on the ground, she develops trembling of the extremities. There is no rhythmic component to it and she does not seem to pass out. It goes on and off for several hours and she does not feel an emotion with it other than occasional frustration.

(*Id.*). Dr. Schomer recommended blood testing, which was done. (*Id.* at 166). The record does not indicate what, if any change in medications were made as a result.

Ms. Landman was admitted to the emergency room at Beth Israel Hospital on December 27, 1999. (*Id.* at 312). That morning she had had 3 episodes of collapse, one at a local pharmacy, one in her office, and a third time in her boss's office. (*Id.* at 318). At that time she pulled a book case down and struck the back of her head, although she did not lose consciousness. (*Id.*). As reported to the hospital:

> [Landman] describes her typical seizures as consisting of blurred vision, often followed by R hand and/or L leg shaking. On rare occasions she has "collapsed" with them. They usually occur once per week, last episode about one month ago. She has had these seizures for about 20 years .... Her only other recent changes have been adjustments with her estrogen/progesterone
> ....

(*Id.*). (*See also id.* at 123). Ms. Landman's dosage of Klonopin was increased and she was to follow up with Dr. Schomer. (*Id.* at 320). She did see Dr. Schomer on January 12, 2000. (*Id.* at 123). As Ms. Landman explained to Dr. Schomer, at the time of her discharge from the hospital she had been "able to walk out on her own without subjective dizziness. She returned home and the next day she felt much better and the third day she said she felt back to normal." (*Id.*). Dr. Schomer thought that

the problem was with the level of Lamictal, which should be around 7 ug/ml. (*Id.* at 124). Testing showed a high level of Lamictal, 11.0 ug/ml, in excess of the target level of 7. (*Id.* at 163). The record does not indicate what, if any, adjustments were made.

### *Ms. Landman Stops Work*

Ms. Landman stopped working on February 16, 2000. (*Id.* at 91). However, there is no information in the record as to what motivated her departure on that date, or if there was any event which triggered her cessation of work at that time.

Ms. Landman next saw Dr. Schomer on March 22, 2000. (*Id.* at 122). At that time, she reported that she was "on a temporary disability leave from work" and that "things have improved dramatically" since being off of work. (*Id.*). Dr. Schomer noted that Ms. Landman "seems to have increased susceptibility to seizure symptoms at work manifest by an increased frequency of occurrence of overt events." (*Id.*). Ms. Landman was finding work "profoundly stressful. Work comes sort of constantly at her, always with urgent deadlines and there is a tremendous amount of memory that is involved where she feels she is so pressured she doesn't even have time to take notes to compensate for her memory deficit." (*Id.*) Dr. Schomer recommended further neuropsychological testing, which was done on May 3, 2000. (*Id.* at 195).

In connection with neuropsychological testing, again done at Beth Israel Hospital, Ms. Landman described her condition as follows:

> She reports recent worsening of memory functions, characterized by difficulty recalling information without cues to trigger her memory. Over the past 3 to 6 months she has noted that she uses

words incorrectly and has problems trying to spell familiar words. She states that her work performance has decreased over the past year, as it has become increasingly difficult for her to recall details of cases. She also reports an increase in her anxiety levels of the past year, which she feels is related to the high-stress nature of her work. She is not engaged in psychotherapy, and states that she takes 1 mg of Klonopin per day for her anxiety. She went on short-term disability because of the collapses and will transfer to long-term disability shortly. She has noted a reduction in stress and the frequency of her episodes since going on disability. She is currently considering volunteer work and is contemplating enrolling in college courses at some point in the future.

(*Id.* at 195–96). After a full battery of tests, it was found that there was very little change from the earlier tests, and that, although Ms. Landman's cognitive problems were "mild in comparison with the general population, they certainly could be problematic in a fast-paced high-stress environment. Time to process and review information will be necessary in order for her to adequately learn and retrieve information." (*Id.* at 200). As Dr. O'Connor concluded:

> The current examination reveals mild declines in complex attention and memory retrieval when compared with her previous testing in 1997. Her performance, however, is generally within the average (albeit low average) range. In terms of her memory functions, there is *less learning and greater difficulty with* spontaneous retrieval on a demanding list learning test, which is consistent with her report of memory retrieval difficulties in daily life. She continues to have reduced retrieval of complex visual information but without evidence of recent decline. In fact, her current cognitive difficulties are consistent with that reported in the initial neuropsychological evaluation in 1995, with the exception that Ms. Landman now reports symptoms associated with mild anxiety.

> There continues to be no clear evidence of focal brain injury in the cognitive profile. Her cognitive profile does suggest some disruption of functions presumed to be mediated by frontal networks, but this pattern could stem from several factors, including anxiety, poor sleep, and adverse effects of medications on cognitive functioning. Treatment should focus on all relevant factors.

(*Id.* at 199). It was recommended that Ms. Landman's medication be reviewed "to limit adverse effects on cognitive functioning," and that Ms Landman begin psychotherapy for treatment of anxiety. (*Id.* at 199–200).

Ms. Landman reviewed these results with Dr. Schomer, who summarized them as showing "no significant cognitive decline" although "there certainly are some deficits." (*Id.* at 188). Dr. Schomer increased Ms. Landman's dosage of Lamictal to 200 mg/3x per day and kept the Klonopin at the same level. (*Id.*). No other changes were made, but Dr. Schomer wanted to follow-up with Ms. Landman in 3–4 months. (*Id.*).

### Paul Revere's June Denial Letter

On June 16, 2000, Paul Revere sent Ms. Landman a letter (the "June Denial Letter") informing her that a "thorough review of your claim for Long Term Disability benefits has been completed, and it has been determined, from the medical records that we currently have available, that you do not meet the definition of disability from your occupation as it is laid out in the group plan." (*Id.* at 174–75). Specifically,

Paul Revere concluded that "[a]fter a review of medical records from Dr. Donald L. Schomer and Beth Israel Hospital no evidence has been found to indicate that you would be unable to perform your occupation of secretary on a full-time or part-time basis." (*Id.*).

### *The Review*

After Ms. Landman spoke with the insurer, her file was reopened.[3] (*Id.* at 186). One of the attorneys at Goldstein & Manello, Jeffrey Musman, sent a letter to Paul Revere at the request of "the administration of [the] firm" to share his observations about Ms. Landman's "deteriorating physical condition." (*Id.* at 206–07). According to Mr. Musman, Ms. Landman had worked for him from 1991 through 1995, during which time she performed her job "at a very high level, having excellent secretarial skills." (*Id.* at 206). Over the last 2–3 years, however, he "began to observe significant increasing deterioration in those skills." (*Id.*). Unfortunately, the balance of the letter speaks in general terms, and the generalized descriptions do not match the facts as presented by Ms. Landman herself. Thus, Mr. Musman asserts, without any details, that the number and magnitude of Ms. Landman's seizures "increased significantly" and that she had to leave work on "many occasions" due to the seizures. (*Id.*). He also claims that Ms. Landman had to take "many medications" for her seizures, (*Id.*), which does not comport with the information provided by Dr. Schomer. Mr. Musman concluded that, apparently over the past several years, and as result "of the seizures or medications or both," Ms. Landman's skills "noticeably deteriorated. She was no longer able to be given multiple tasks as she became confused and stressed, both of

which conditions seem to further exacerbate the physical condition, which in turn seemed to bring about more frequent and often more pronounced seizures." (*Id.* at 207).

In addition to receiving Mr. Musman's letter, Paul Revere collected reports relating to earlier examinations of Ms. Landman which were not in its files. (*E.g., id.* at 187–88). Paul Revere also had the medical records reviewed by an in-house consultant, Dr. Tanya Horne. (*Id.* at 218–220). Meanwhile, on June 22, 2000, Paul Revere began making benefit payments to Ms. Landman under a reservation of rights. (*Id.* at 211). Paul Revere later agreed not to seek repayment of these benefits even if it ultimately concluded that it had properly denied her claim. (*Id.* at 250).

Dr. Home reviewed Ms. Landman's medical history, finding, *inter alia,* that Ms. Landman had reported "a history of seizure disorder since late adolescence" and accurately described the diagnostic findings over the years. (*Id.* at 219–20). Where Dr. Horne differed from Dr. Schomer was not so much in diagnosing Ms. Landman's medical condition, but, rather, in determining the effect of that condition on Ms. Landman's ability to work. Dr. Home's report correctly noted that Ms. Landman was "a legal secretary diagnosed with epilepsy or recurrent seizures," that she had been employed with the same employer for 17 years, and that she had been out of work since February 16, 2000. (*Id.* 218–19). As Dr. Horne concluded in part:

> It is not unusual for emotional factors to trigger seizure activity. Her most recent neuropsychiatric testing has not shown a significant decline from the

---

**3.** The details of the claims handling process can be found in this court's original R & R. Only facts relevant to the issues presently before the court will be included herein.

1997 testing and is more consistent with testing done in 1995. *The insured has demonstrated the ability to work, though she reports memory difficulties, they have not declined from her previous level in 1997 and 1995 when she was working.* Dr. Schomer indicates some of her symptomatology may be due to her medications. Neuropsych testing also indicated some of the findings in the frontal lobe may be due to medication effect or anxiety. Lamictal may cause blurred vision, dizziness, nausea and ataxia, which are all symptoms the insured has experienced. *While the insured has had witnessed episodes that have been classified as seizure activity and reported memory difficulties there has not been a significant change in her condition since 1995.* Her medication side effects may affect her level of functionality to some degree but *with appropriate adjustment would not be expected to be a source of impairment beyond several weeks.* She has been on Lamictal since 1994 and had been on 600 mg a day since May 1998. *Dr. Schomer indicates he would like for her seizure events to be less frequent before returning to work.* Usual R & L's associated with seizures would be no driving, operating machinery or being at unprotected heights. *The records in the file do not support an impairment that would preclude all work [capacity] as indicated by Dr. Schomer.* I agree with the need to have any psychotherapy notes and neuropsych testing reviewed by the psychiatric department if the insured has received any such treatment.

(*Id.* at 220) (emphasis added).

In August, 2000, Paul Revere had Ms. Landman's May 2000 neuropsychological report reviewed by an in-house consultant, Alan E. Cusher, Ph.D. (*Id.* at 329). Dr. Cusher noted that the "current neuropsychologic results are somewhat inconsistent with each other in that tests tapping into similar functions produced differing levels of performance." (*Id.*). For the most part, according to Dr. Cusher, the test results were within the normal range, with some skills being at the low average while others fell clearly above the average. (*Id.*). Given these inconsistencies, the Doctor was interested in reviewing more information. (*Id.*). Nevertheless, he concluded:

> based on what I have reviewed, it is more likely that if the Insured is limited from work, it is her ability to deal with stress that is more of a factor. Within this context, Dr. O'Connor's recommendations for psychotherapy and stress management would appear to be appropriate. *Following such treatment in combination with the development of adaptive cognitive compensatory strategies, the Insured should be able to return to her former duties possibly with less efficiency.*

(*Id.*) (emphasis added). Dr. Cusher updated his report on October 6, 2000, after having the opportunity to review the neuropsychological evaluations from 1995 and 1997. (*Id.* at 330). At that time he noted "possible inconsistencies in performance" but needed to review raw data to be sure. (*Id.*). Dr. Cusher suggested obtaining another neuropsychological evaluation (*id.*), however, this examination was never done.

On November 29, 2000, Dr. Schomer completed another Attending Physician's Statement for Paul Revere wherein he diagnosed Ms. Landman's condition as "simple partial epilepsy" with a "guarded" prognosis. (*Id.* at 336). Dr. Schomer found Ms. Landman totally disabled from her own job, although it was questionable whether she was totally disabled from any other work. (*Id.*). He was "unable to gauge" when Ms. Landman could resume

work without restrictions, although he found her to be a candidate for vocational rehabilitation. (*Id.*).

### Paul Revere's Second Denial

By letter dated December 5, 2000, Paul Revere again denied Ms. Landman's claim (the "December Denial Letter"). (*Id.* at 339–40). As Paul Revere wrote, "[o]ur medical experts concur that your medical records do not indicate a disability that would prevent you from your sedentary occupation on a full or part-time basis," and "our medical specialists do not feel that the medical records support an impairment that would preclude all work activity or restrict the performance of your occupation as legal secretary . . . ." (*Id.* at 340). On December 16, 2000, Paul Revere stopped paying Ms. Landman benefits. (*Id.*).

### Post–Denial Medical Information

█ After December 5, 2000, Ms. Landman submitted additional information to Paul Revere which was not considered by the company. (PF ¶ 48). Paul Revere argues that this information is irrelevant and not properly included in the record. This court agrees. *See Lopes v. Met. Life Ins. Co.*, 332 F.3d 1, 5 (1st Cir.2003) ("In reviewing an ERISA determination for arbitrariness, we and the overwhelming majority of other circuits have held that there is a strong presumption that the required deferential review of a plan administrator's benefits decision should be limited to the evidentiary record presented to the administrator.") (citing *Liston v. Unum Corp. Officer Severance Plan*, 330 F.3d 19, 23 (1st Cir.2003)). Nevertheless, for completeness this information will be addressed briefly.

On October 10, 2001, the Social Security Administration had approved Ms. Landman's claim for disability benefits. (AR at 351). Ms. Landman also submitted several additional treatment notes made by Dr. Schomer. Thus, Dr. Schomer's treatment note from December 7, 2000 indicated that she was discharged from the hospital on that date after being in for a little over a week. (*Id.* at 355, 358–59). During that time she was taken off Lamictal and began treating with Trileptal. (*Id.* at 355). Upon discharge, Dr. Schomer had "talked to her about voluntarily stopping driving for at least the near foreseeable future and that [they would] discuss that again as she tolerates medicine and as [they] see what kind of clinical response she has." (*Id.*). Ms. Landman was seen by Dr. Schomer again on December 20, 2000, at which time he confirmed that his "diagnosis has always been entertained as a simple partial seizure disorder[.]" (*Id.* at 357). Ms. Landman had had a few, mild, events and Dr. Schomer recommended a follow-up in a few months. (*Id.*).

Ms. Landman was next seen by Dr. Schomer on March 8, 2001. (*Id.* at 354). As of that time, she was still having one to two brief seizures a week, which were "very curious" as they also involved some involuntary verbalization (*Id.*). She was doing part-time volunteer work and planned on enrolling in some courses. (*Id.*). Dr. Schomer recommended some testing of her medication levels and a follow up visit in 4—6 months. (*Id.*).

Ms. Landman saw Dr. Schomer again on July 5, 2001. (*Id.* at 352). As of that time she was feeling "profoundly fatigued" and experiencing an increased frequency of seizure-like events, which included "a lot of wild flailing and jerking of the right arm and, to a lesser degree, both legs." (*Id.*). Dr. Schomer again sent Ms. Landman for testing of her medication levels, and proposed altering her medication. (*Id.*) There is no further information in the record as

to whether her medication was, in fact, changed thereafter.

## III. DISCUSSION

### A. *Standard of Review*

■ "When, as in this case, a plan administrator has discretion to determine an applicant's eligibility for and entitlement to benefits, the administrator's decision must be upheld unless it is 'arbitrary, capricious, or an abuse of discretion'". *Gannon v. Met. Life Ins. Co.,* 360 F.3d 211, 212–13 (1st Cir.2004) (citation omitted). This means that the court can overturn Paul Revere's decision "only if the insurer's eligibility determination was unreasonable in light of the information available to it .... Contrarily, the insurer's decision must be upheld if it was within the insurer's authority, reasoned, and supported by substantial evidence in the record." *Boardman v. Prudential Ins. Co. of Amer.,* 337 F.3d 9, 15 (1st Cir.2003) (internal quotation marks and citations omitted). "Substantial evidence exists it if is reasonably sufficient to support a conclusion." *Sullivan v. Raytheon Co.,* 262 F.3d 41, 50–51 (1st Cir.2001) (internal quotation marks and citations omitted). The existence of contrary evidence does not, in and of itself, make the administrator's decision arbitrary. *See Vlass v. Raytheon Employees Disability Trust,* 244 F.3d 27, 30 (1st Cir. 2001) (internal citation omitted). "Review under this standard is narrow and does not allow the court to substitute its own judgment for that of the administrator of a plan." *Greene v. Metro. Life Ins. Co.,* 924 F.Supp. 351, 357 (D.R.I.1996), and case cited.

■ In reviewing a decision to terminate benefits in the context of motions for summary judgment, "the district court must ask whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." *Leahy v. Raytheon Co.,* 315 F.3d 11, 18 (1st Cir.2002).[4] In making and reviewing the decision on eligibility, neither plan administrators nor reviewing courts are required "to accord special deference to the opinions of treating physicians." *Gannon v. Met. Life Ins. Co.,* 360 F.3d at 215.

Finally, Ms. Landman contends that in reviewing Paul Revere's decision, this court must consider that the insurer exhibited an "actual conflict of interest." *Plaintiff's Memorandum in Support of Her Cross–Motion for Judgment on the Administrative Record* (Docket # 30) ("Pl.'s Mem.") at 4. The First Circuit has held that an insurer's conflict of interest should be considered by the court in assessing the reasonableness of the insurer's conduct. *See Pari–Fasano v. ITT Hartford Life & Accident Ins. Co.,* 230 F.3d 415, 419 (1st Cir.2000). Here, however, the record does not support Ms. Landman's claim that a conflict of interest existed.

■ Ms. Landman argues, without citation, that the fact that Paul Revere paid Ms. Landman benefits under a reservation of rights, which is not expressly authorized by the Plan, constitutes a conflict of interest. (Pl.'s Mem. at 4). As she argues, paying benefits under a reservation of rights

---

4. It has been conclusively established in the First Circuit that "there cannot possibly be a conflict between the standard of review that federal courts must apply on summary judgment and the degree of deference that such courts ultimately owe to plan administrators." *Leahy v. Raytheon Co.,* 315 F.3d at 17. *Accord Cook v. Liberty Life Assur. Co. of Boston,* 320 F.3d 11, 18 n. 8 (1st Cir.2003).

is simply a way for Paul Revere to delay issuing a denial within the regulatory time frame, and its [sic] doing so Paul Revere serves its own interest. Additionally, Paul Revere subsequently agreed not to seek repayment of benefits extended after a telephone call with the employer (AR 247; 250). This evidences the insurance company's desire to please the employer in the short term in order to continue collecting premiums. In other words, Paul Revere paid benefits in order to placate its customer, the sponsor of the plan, in order to receive continued business and continued premiums.

(*Id.* at 5). Such conduct, according to Ms. Landman, constitutes an "actual conflict of interest." (*Id.*).

The mere fact that Paul Revere may have gone beyond the express terms of the Plan to allow Ms. Landman and the insurer time to fully develop the factual record does not support a conclusion of wrongdoing on the part of Paul Revere. *See Pari–Fasano v. ITT Hartford,* 230 F.3d at 421 n. 3 (insurer allowed an entire second round of claim examination in order to try and resolve dispute, even though claimant not entitled to such review under the plan). Obviously, Paul Revere could simply have stood by its June decision and denied Ms. Landman's claim there and then. The fact that Paul Revere may have attempted to please its customer in order to receive more business is, at most, a generous business decision—it does not create a situation where Paul Revere was inclined to be biased in its handling of Ms. Landman's claim. "To affect the standard of review ... a conflict of interest must be real. A chimerical, imagined, or conjectural conflict will not strip the fiduciary's determination of the deference that otherwise would be due." *Leahy v. Raytheon Co.,* 315 F.3d at 16, and cases cited. "The

conflict that the plaintiff envisions does not pass through this screen." *Id.*

Where, as here, the circumstances do not indicate an improper motivation on the part of Paul Revere, the next step is for the court to "ensure that the termination decision was not objectively unreasonable in light of the available evidence" without factoring a conflict of interest into the equation. *Pari–Fasano v. ITT Hartford,* 230 F.3d at 419. For the reasons detailed below, this court concludes that Paul Revere's decision was not "objectively unreasonable."

## B. Paul Revere's Decision Was Not Arbitrary, Capricious or an Abuse of Discretion

■ As an initial matter, Ms. Landman questions which time period should be the focus of review by the court, and opines that it should either be February 16, 2000, the "disability onset date," or the period after December 16, 2000, the date Paul Revere stopped paying benefits. (Pl.'s Mem. at 5). However, it is clear that it is the December 5, 2000 final decision that is the basis of Ms. Landman's appeal. Therefore, this court will determine whether Paul Revere's eligibility determination was unreasonable in light of the information available to the company at that time. *See Terry v. Bayer Corp.,* 145 F.3d 28, 35 (1st Cir.1998) (it is the final decision which is subject to review).

Ms. Landman also contends that Paul Revere reviewed her claim under the "any occupation" standard instead of the "own occupation" standard applicable to the first 24 months of benefits. (Pl.'s Mem. at 9). Ms. Landman bases this contention principally on the fact that Dr. Home, who reviewed the claim for Paul Revere, stated in

part that "the records in the file do not support an impairment that would preclude all work [capacity] as indicated by Dr. Schomer." (AR at 220; Pl.'s Mem. at 16; Pl's Reply Mem. (Docket # 39) at 1). However, a fair reading of Dr. Home's report is that she was disagreeing with Dr. Schomer's conclusion that Ms. Landman could not work at all at her job as a legal secretary. Thus, Dr. Horne clearly knew that Ms. Landman had been employed as a legal secretary, that she had worked at the same job for 17 years, and that she had "demonstrated the ability to work" at her job, despite her medical condition. (AR at 218–20). Moreover, the policy at issue was clearly identified as an "own occupation" policy. (Id. at 218). Therefore, the record does not support Ms. Landman's contention that Dr. Horne applied the wrong standard.

Ms. Landman also relies on Dr. Cusher's statements as support for this argument. However, like Dr. Home, Dr. Cusher clearly was offering his opinion as to Ms. Landman's ability to work as a legal secretary. Thus, Paul Revere's inquiry to Dr. Cusher stated that it was an "own occupation" policy. (Id. at 253). Also, Dr. Cusher specifically asked Paul Revere whether the policy "reverted to any oc at some point," thereby indicating that he understood that he was being asked to make an "own occupation" assessment. (Id. at 326). Finally, it is clear from his report that Dr. Cusher was evaluating Ms. Landman's ability to perform her job as a legal secretary. (Id. at 329). Therefore, Ms. Landman's contention that "neither Dr. Home, nor Dr. Cusher evaluated the key issue in this claim: whether the medical records support an impairment that precludes the performance of Plaintiff's occupation as Legal Secretary" is without merit. (Pl.'s Mem. at 9).

While there is conflicting evidence in the file about the causes of Ms. Landman's condition, there is an "absence of adequate evidence in [Ms. Landman's] medical records indicating that [her] condition imposed limitations on her ability to perform the material and substantial duties of her own occupation" and, in fact, there is substantial evidence to the contrary. Boardman v. Prudential Ins. Co., 337 F.3d at 17. Under such circumstances, the decision that Ms. Landman failed to meet the definition of Total Disability under the Plan was not arbitrary or capricious. (Id.).

Since the onset of her condition in the early 1990s until she stopped working, Ms. Landman suffered recurring seizure-like events, which often took place several times per week. (See AR at 145–46). The events happened at work on occasion, and her condition required monitoring of her medication and, at times, hospitalization. (Id. at 146–47). Dr. Schomer himself noted at the time Ms. Landman filed her claim that she needed "medication adjustments." (Id. at 92). His goal was to reduce the frequency of seizure events before Ms. Landman was allowed to return to work. (Id.). There is no indication in the record that Ms. Landman's condition prevented her from performing the tasks required of a legal secretary and even Dr. Schomer does not offer an opinion to that effect.

Without repeating all the details of her medical history described above, the record does not support Ms. Landman's claim that her condition seriously worsened over time. Her last event before leaving work occurred on December 27, 1999, when she collapsed three times. (Id. at 318). However, it was determined that her medication level was too high at that time. (Id. at 123–24, 163).

After her hospital treatment following the incident of December 27, 1999, Ms. Landman "was able to walk out on her own without subjective dizziness. She returned home and the next day she felt much better and the third day she said she felt back to normal." (*Id.* at 123). Between the incidents of December 27, 1999 and March 22, 2000, Ms. Landman reported only "one minor seizure event." (*Id.* at 122). Thereafter, she had "about one seizure every two weeks" which were "all simple partial seizures, some more intense than others. The brief ones are usually just tremoring in the hand and leg. The more severe ones include the intense senses of fear and generalized motoric activity without loss of consciousness." (*Id.* at 188).

These reports of seizures are consistent with her prior history. For example, in May 1995, she was reporting seizures twice a week. (*Id.* at 125). In November 1997, she was having seizures every two weeks. (*Id.* at 130). When events became more frequent in July 1999, Dr. Schomer indicated that her medication would be changed. (*Id.* at 133). Between July and December 27, 1999, the episodes had gone down to about once a week, with the last episode being about a month before. (*Id.* at 318). Throughout this period, Ms. Landman had been employed as a legal secretary. In the absence of a change in her condition, Paul Revere's conclusion that she could continue in that occupation is not arbitrary or capricious.

Similarly, the record does not support Ms. Landman's claim that her declining memory issues precluded her ability to continue to work as a legal secretary. As detailed above, the testing in 2000 revealed

"no significant cognitive decline," although there were "some deficits." (*Id.* at 188). These deficits, however, did not prevent her from working in her own occupation.

Ms. Landman's fundamental claim is that her position at Goldstein & Manello had become too stressful for her, be it as a result of her seizure condition, anxiety attacks or otherwise. However, the record does not support a conclusion that Ms. Landman's inability to handle the stress at one firm meant that she could not perform her occupation as a legal secretary elsewhere. As the court held in *Pelletier v. Reliance Standard Life Ins. Co.*, 223 F.Supp.2d 298 (D.Me.2002), where the court upheld the denial of total disability benefits based on fibromyalgia and osteoarthritis which was aggravated by the stress and anxiety of plaintiff's job:

> It is not one's job with a specific employer, in a particular work environment or in a particular occupational field, that one must be unable to perform. Given Plaintiff's present claim that it was the stress and anxiety of her job that was exacerbating her condition ... and the reports of [a doctor] that indicated she was physically capable of the light work her occupation requires, Defendant was not unreasonable in citing the lack of evidence to show that Plaintiff was not able to perform her occupation for another employer in an alternative work setting.

(*Id.* at 305–06). Similarly, in the instant case, Ms. Landman had to be unable to perform the "important duties of [her] own occupation on a full-time or part-time basis," she was not limited to a position as a legal secretary at Goldstein & Manello.[5]

---

5. This court notes that at least one Plan document in the instant case expressly provides that "[a]n Employee's Disability is determined relative to his ability or inability to work. It is not determined by the availability of a suitable position with his Employer." (AR at 37).

"In light of the record evidence as a whole," therefore, this court "cannot say that [Paul Revere's] decision to terminate [Ms. Landman's] benefits was arbitrary or capricious." *Gannon v. Met. Life Ins. Co.,* 360 F.3d at 216.

## IV. CONCLUSION

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that Paul Revere's Motion for Summary Judgment (Docket # 25) be ALLOWED, and that Plaintiff's Cross–Motion for Judgment on the Administrative Record (Docket # 29) be DENIED.[6]

July 12, 2004.

---

6. The parties are hereby advised that under the provisions of Fed.R.Civ.P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. *See* *Keating v. Sec'y of Health & Human Servs.,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604–605 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376, 378–79 (1st Cir.1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *see also Thomas v. Arn,* 474 U.S. 140, 153–54, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985). *Accord Phinney v. Wentworth Douglas Hosp.,* 199 F.3d 1, 3–4 (1st Cir.1999); *Henley Drilling Co. v. McGee,* 36 F.3d 143, 150–51 (1st Cir.1994); *Santiago v. Canon U.S.A., Inc.,* 138 F.3d 1, 4 (1st Cir.1998).